# UNITED STATES DISTRICT COURT FILED

**EASTERN** DISTRICT OF **CALIFORNIA**      JUL 1 4 2008

# SEALED

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                    DEPUTY CLERK

## UNITED STATES OF AMERICA
### v.

THAU BENH CAM,
ARTHUR LAO FONG LO,
BANG THAI TANG,
QUINTILIAN MINHQUAN HUYNH, aka Quincy,
VINH VAN VO,
CALVIN TRUONG,
TAN QUOC TO,
VINCENT KWOK HUNG KAN,
PETER DUC TRUONG,
REUTHA RICH YUN,
TIM TUYEN

## CRIMINAL COMPLAINT

CASE NUMBER:

### 2 0 8 - MJ - 2 4 0      EFB

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.  On or about **November 2007 through July 2008** in **Sacramento** County, in the Eastern District of California defendants did,

▶ **Conspire to Distribute, Possess with Intent to Distribute and Manufactured a Controlled Substance, and Used a Communication Facility in Furtherance of a Drug Trafficking Felony**

in violation of Title **21**, United States Code, Section **841(a)(1)**, **846 and 843(b)**.  I further state that I am a Special Agent with the Federal Bureau of Investigation and that this complaint is based on the following facts:

▶ **See Affidavit attached hereto and incorporated fully herein**.

**X**  Continued on the attached sheet and made a part hereof.

Signature of Complainant    CARRIE MCDOUGLE
                                            Special Agent, FBI

Sworn to before me, and subscribed in my presence

_____
Date    July 14, 2008

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

at    Sacramento, California

City and State

_____
Signature of Judicial Officer

## Affidavit in Support of Complaints, Arrest Warrants and Search Warrants

I, Carrie McDougle, being duly sworn state the following:

## Background and Experience

1.    I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed for approximately six years. I am assigned to the Sacramento Division. I have completed sixteen weeks of FBI Basic Agent training at the FBI Academy at Quantico, Virginia. I have received training in the Controlled Substance Act, Title 21 of the United States Code, including Sections 841(a)(1) and 846, Controlled Substance violations and Conspiracy to Commit Controlled Substance violations. During the course of my employment with the FBI, I have been assigned to various taskforces, including the High Intensity Drug Trafficking Area (HIDTA) Task Force. I am currently assigned to the Safe Streets Task Force which investigates gangs and drugs.

2.    I am familiar with investigations of drug trafficking organizations, methods of importation and distribution of controlled substances, and financial investigations. I have participated in numerous Federal and State search warrants involving controlled substances, seizure of narcotics related records and other types of evidence that document the activities of criminal organizations in both manufacturing and distribution of controlled substances. To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources, including physical and electronic surveillance and various types of infiltration, including undercover agents, informants, and cooperating sources. Through these investigations, my training and experience, and conversations with other experienced agents and law enforcement personnel, I have become familiar with the methods used by traffickers to smuggle and safeguard narcotics, to distribute narcotics, and to collect and launder related proceeds. I am aware of sophisticated tactics that are often used to attempt to thwart investigations of narcotics organizations. My knowledge of these tactics, which include the utilization of numerous and different cellular telephones, counter-surveillance equipment and techniques, false and/or fictitious identities, and coded communications and conversations, have been particularly useful and relevant in this investigation.

## Basis of Information for Search Warrants

3.    The information contained in this affidavit is based upon my personal observations, the observations of other law enforcement officers, my review of official police and government reports and audio and video recordings, the controlled purchases of quantities of controlled substances utilizing confidential sources and/or undercover officers/agents, and the review of transcripts and/or audio recordings of intercepted telephone calls from Target Telephone #1 (Thau Benh Cam – 916-813-1547) and Target Telephone #2 (Thau Benh Cam – 916-599-4333). Because this affidavit is being submitted for the limited purpose of securing warrants, I have not included each

and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary and appropriate to establish the foundation for the warrants requested herein.

### Persons and Places for Whom Warrants are Sought

4.      This affidavit is submitted in support of a request that Complaints, Arrest Warrants, and Search Warrants be issued for the following people and places related to violations of Title 21, United States Code, Sections 841 (a)(1), 846 and 843(b), Distribution of Controlled Substance, Conspiracy to Distribute Controlled Substance and Use of a Communication Facility to Further a Drug Trafficking Felony. As set forth below, there is probable cause to believe that evidence (more particularly described in Attachment "B" and incorporated herein) tending to establish the existence of these violations and to launder and/or conceal the proceeds of these violations is presently located at the following places. Search warrants are being sought simultaneously in both the Eastern and Northern Districts of California.

### Individuals:

1.      **Thau Benh CAM**
2.      **Arthur Lao Fong LO**
3.      **Bang Thai TANG**
4.      **Quintilian Minhquan HUYNH, aka Quincy**
5.      **Vinh Van VO**
6.      **Calvin TRUONG**
7.      **Tan Quoc TO**
8.      **Vincent Kwok Hung KAN**
9.      **Peter Duc TRUONG**
10.     **Reutha Rich YUN**
11.     **Tim TUYEN**

### Places:

### Eastern District of California

1.      **5911 Deepdale Way, Elk Grove, California**
2.      **8700 Festival Drive, Elk Grove, California**
3.      **9611 Pilliteri Way, Elk Grove, California**
4.      **5926 Stacy Avenue, Sacramento, California**
5.      **9744 Westfalen Way, Elk Grove, California**
6.      **7911 Deer Creek, Sacramento, California**
7.      **8930 White Star, Elk Grove, California**

### Northern District of California

8.      **701 MacArthur Drive, Oakland, California**

9.    **1257 Huntington Street, Crescent City, California**

## Overview of the Investigation

18. The Federal Bureau of Investigation (FBI) and the Safe Streets Task Force (SSTF) have been investigating members of an Asian gang called HOP SING since approximately March 2007. This investigation has revealed that Thau Benh CAM and others, are engaged in a Conspiracy to Distribute Ecstasy and Marijuana in the Sacramento and Elk Grove, California area.

19. This investigation included the interception of wire communications to and from AT&T cellular telephone number (916) 813-1547 (Target Telephone #1-utilized by Thau Benh CAM), the interception of wire communications to and from Cellco Partnership dba Verizon Wireless cellular telephone number (916) 599-4333 (Target Telephone #2-utilized by Thau Benh CAM), the undercover purchase of controlled substances from members of this organization, and the collection of information from confidential sources. This affidavit is therefore reflective of several different sources of information, and is not necessarily delineated in chronological order.

## Information Obtained Through the Interception of Wire Communications to and from Cellular Telephone Number (916) 813-1547 (Target Telephone #1) and Cellular Telephone Number (916) 599-4333 (Target Telephone #2)

20. During the course of this investigation, through extensive telephone analysis, Thau Benh CAM was determined to be using a cellular telephone, assigned telephone number (916) 813-1547, to facilitate the distribution of marijuana and ecstasy.

21. On May 2, 2007, a subpoena was served on AT&T for subscriber information to cellular telephone (916) 813-1547. AT&T records indicated that the subscriber to telephone number (916) 813-1547 was Eric LY at 293 Seavey Circle, Sacramento, California. AT&T records further indicated the telephone was activated on March 6, 2007 as a new account and is a pre-paid phone.

22. On November 2, 2007, the Honorable Morrison C. England, Jr., United States District Judge, Eastern District of California, signed a court order (07-SW-317-MCE) authorizing the interception of wire communications on cellular telephone number (916) 813-1547 (Target Telephone #1), for a period not to exceed thirty days from the time of the initial intercept.

23. On November 5, 2007, agents began the interception of wire communications of Target Telephone #1. Between November 5, 2007 and December 4, 2007, agents of the Sacramento Field Office, to include your affiant, along with members of other law enforcement agencies, conducted investigative techniques related to the intercepted wire communications of Thau Benh CAM over Target Telephone #1. These investigative techniques included: the interception and recording of pertinent wire communications to and from Target Telephone #1, electronic and physical surveillance, and controlled purchases of ecstasy from members of this organization.

24. On December 4, 2007, the Honorable Morrison C. England, Jr., United States District Judge, Eastern District of California, signed a court order (07-SW-317-MCE) authorizing the continued interception of wire communications on cellular telephone number (916) 813-1547 (Target Telephone #1), for an additional thirty day period. This period of interception was ended on December 7, 2007 due to Thau Benh CAM discontinuing the use of the telephone.

25. After Thau Benh CAM discontinued use of Target Telephone #1, extensive telephone analysis was done on telephone records of Thau Benh CAM's known associates. It was determined that Thau Benh CAM was using a cellular telephone, assigned telephone number (916) 599-4333.

26. On December 13, 2007, a subpoena was served on Cellco Partnership dba Verizon Wireless for subscriber information to cellular telephone (916) 599-4333. Verizon Wireless records indicated that the subscriber to telephone number (916) 599-4333 was Eric LU, 293 Seavey Circle, Sacramento, California. Verizon Wireless records further indicated the telephone was activated on December 1, 2007 as a new account and is a pre-paid phone.

27. On January 9, 2008, the Honorable Morrison C. England, Jr., United States District Judge, Eastern District of California, signed a court order (08-SW-13-MCE) authorizing the interception of wire communications on cellular telephone number (916) 599-4333 (Target Telephone #2), for a period not to exceed thirty days from the time of the initial intercept.

28. On January 10, 2008, agents began the interception of wire communications of Target Telephone #2. Between January 10, 2008 and February 8, 2008, agents of the Sacramento Field Office, to include your affiant, along with members of other law enforcement agencies, conducted investigative techniques related to the intercepted wire communications of Thau Benh CAM over Target Telephone #2. These investigative techniques included: the interception and recording of pertinent wire communications to and from Target Telephone #2, electronic and physical surveillance, search warrants and controlled purchases of ecstasy from members of this organization.

29. On February 8, 2008, the Honorable Morrison C. England, Jr., United States District Judge, Eastern District of California, signed a court order (08-SW-13-MCE) authorizing the continued interception of wire communications on cellular telephone number (916) 599-4333 (Target Telephone #2), for an additional thirty day period beginning February 8, 2008. Between February 8, 2008 and March 8, 2008, agents of the Sacramento Field Office, to include your affiant, along with members of other law enforcement agencies, continued to conduct the investigative techniques mentioned above related to the continued intercepted wire communications of Thau Benh CAM over Target Telephone #2.

30. Your affiant believes that Thau Benh CAM is a Elk Grove/Sacramento-based distributor of ecstasy and marijuana, and that Thau Benh CAM and Bang Thai TANG (aka Thai) and others have used, or are using, communications devices in furtherance of drug trafficking felonies in violation of Title 21, United States Code, Section 843(b)-Use of Communications Facility to Facilitate a Drug Trafficking Felony, and Title 21, United States Code, Sections

841 (a)(1) and 846-Distribution of Controlled Substances and Conspiracy to Distribute Controlled Substances. This belief is based upon the information obtained from the intercepted telephone calls and other information obtained during the course of this investigation, further described below.

31. Throughout the following portions of this affidavit, your affiant recounts intercepted wire communications between individuals, often identifying the individuals by name. In each instance involving an intercepted telephone call, when a particular person is identified as having been a participant in a conversation, that person has been identified by case agents, the monitor, or transcriber. The identification of these persons was based upon either the person identifying themselves by name, other parties to the call referring to the person by name, or through recognition of the individual's voice by an agent or monitor who had previously heard the voice on a sufficient number of occasions to identify the speaker through hearing the voice only, or other mean identified below.

32. Every effort was made during the interception of wire communication to and from Target Telephone #1 and Target Telephone #2, to utilize surveillance when appropriate and possible, to ascertain the identities of the individuals to whom Thau Benh CAM was speaking during the respective intercepted telephone conversations. Throughout the course of this investigation, this organization has been extremely surveillance-conscious, and repeated interceptions of Target Telephone #1 and Target Telephone #2 have revealed that members of the organization have observed surveillance units, or suspected that they observed surveillance units, observing their activities, and have modified their actions/behavior in response to the perceived presence of law enforcement surveillance.

33. The telephone conversations intercepted were in both the Cantonese language and the English language. The intercepted calls which consisted entirely of, or contained portions of, the Cantonese language were summarized and/or translated to English for use by your affiant and other law enforcement agents involved in the investigation.

34. Based upon training and experience, your affiant knows that distributors of controlled substances (marijuana and ecstasy) often utilize cellular telephones to conduct distribution activities, and that these cellular telephones are often subscribed to in the names of third parties to avoid law enforcement detection. Additionally, your affiant knows that code words are often used to discuss contraband while talking on the telephone and counter-surveillance maneuvers are conducted to identify and/or impede law enforcement detection. Based upon training and experience, and the training and experience of individuals monitoring the conversations on these wire communications interceptions, your affiant believes this organization attempts to disguise the criminal nature of the conversation by the use of codes during the conversations, as outlined further in this affidavit.

## Calls pertinent to Target Telephone #1 and Target Telephone #2

35. Between November 2, 2007 and December 6, 2007 (Target Telephone #1) and January 9, 2008 and March 8, 2008 (Target Telephone #2), approximately 2,300 calls were intercepted pursuant to the aforementioned court orders. Of those calls, approximately 869 were

determined to be "pertinent calls", that is, calls related to the illegal possession, distribution, attempted distribution of controlled substances, and/or calls related to payments or collections of money owed for controlled substances transactions. The following portion of this affidavit is arranged to highlight the "pertinent" calls and/or surveillance observations related to the subject(s) that your affiant requests the issuance of arrest warrants and/or search warrants, pursuant to violations of Title 21, Sections 841(a)(1), 843(b) and 846. It should be noted that this affidavit does not include every pertinent intercepted call, and the calls are not necessarily in chronological order.

### November 30, 2007 - Conspiracy to Manufacture and Distribute Marijuana
### Pick-up of 100 marijuana plants
### Thau Benh CAM
### Tim TUYEN
### Vincent Kwok Hung KAN
### Calvin TRUONG
### Quintilian Minhquan HUYNH, aka Quincy

36. On September 22, 2007, a court order was served on AT&T Wireless Services (AT&T) for subscriber information on telephone number (916) 397-3253. AT&T records indicated the subscriber to the aforementioned telephone number was Tim TUYEN, 4656 12th Avenue, Sacramento, California.

November 25, 2007 – 8:33 P.M. – **Call #1759**

37. Target Telephone #1 received an incoming call from telephone number (916) 397-3253. During this call, Tim TUYEN asked CAM if "Vincent" had any "kids" for CAM. CAM said that "Vincent" hadn't called CAM back. CAM told TUYEN that he would call TUYEN back.

38. Your affiant believes that "Vincent" likely referred to Vincent KAN, who is noted in paragraph 40 below meeting Thau Benh CAM. Your affiant believes that "kids" likely referred to small marijuana plants. This belief is based on her knowledge that marijuana growers tend to refer to the different stages of marijuana plant growth with terms such as "babies" and "kids". It is believed that "kids" referred to plants that are ready to be transferred into larger pots and out of the trays that are grown from "babies".

39. On November 13, 2007, an administrative subpoena was served on T-Mobile for subscriber information on telephone number (415) 321-0566. T-Mobile records indicated that this is a pre-paid phone and does not require the user to provide subscriber information.

40. On November 8, 2007, CAM was followed to 701 MacArthur Blvd, Oakland, California, by surveillance units. A vehicle (CA License 4DRY600) belonging to Vincent Kan was observed at this location. On November 18, 2007, CAM went to a restaurant in Sacramento called Yummy Guide. Calls intercepted on Target Telephone #1 revealed that CAM planned to meet the user of telephone number (415) 321-0566 at the restaurant. Surveillance units

positively identified Vincent KAN as the individual that CAM met at the restaurant, thus it is believed that KAN is the user of this phone.

November 25, 2007 – 8:34 P.M. – **Call #1760**

41. Immediately after talking to TUYEN, Target Telephone #1 placed an outgoing call to telephone number (415) 321-0566. During this call, CAM asked KAN "how are the kids?". KAN told CAM "not done yet". CAM expected them to be ready. KAN said "let it grow". Later in the conversation, KAN asked CAM "how many you need....2 tray?" CAM said "100". KAN said he would get as many as he could and told CAM he (KAN) was "fixing it myself, so there will be no problems".

42. Your affiant believes there may have been a problem with previous shipment of "kids" from KAN which is why KAN told CAM he was "fixing it myself". It is believed that CAM told KAN that he (CAM) wanted "100" marijuana baby plants.

November 25, 2007 – 8:35 P.M. – **Call #1761**

43. CAM immediately called TUYEN after talking to KAN. Target Telephone #1 placed an outgoing call to telephone number (916) 397-3253. During this call, CAM relayed what KAN had told him. TUYEN told CAM, "tell him to fix you 3 trays". CAM said he would tell KAN.

November 25, 2007 – 8:36 P.M. – **Call #1762**

44. Target Telephone #1 placed an outgoing call to telephone number (415) 321-0566. CAM told KAN that "his friend" wanted "3 trays". KAN told CAM that he wasn't sure he (KAN) would have that much and would probably only have "2".

November 25, 2007 – 8:37 P.M. – **Call #1763**

45. Target Telephone #1 placed an outgoing call to telephone number (916) 397-3253. CAM again relayed to TUYEN the information KAN told him. TUYEN said "2 trays will be enough".

46. Your affiant believes that this series of phone calls detailed the quantity of "kids" that KAN would have ready. It is believed that the actual pick-up date for the "kids" was discussed in other calls, not intercepted, or was discussed in person prior to the pick-up date of November 30, 2007, because a) an actual pick-up date occurred; b) previous intercepted phone calls referenced KAN getting the marijuana ready for CAM; c) surveillance units observed CAM and KAN face to face in between intercepted phone calls and the actual pick-up date.

TRUONG and HUYNH pick-up the plants

47. On November 11, 2007, an administrative subpoena was served on Metro PCS for telephone number (916) 753-2877. Metro PCS records indicated that the subscriber of this telephone number was Tony Tran, 6143 Belfield Circle, Elk Grove, California. Surveillance of CAM's residence, during times in which intercepted calls indicated that the user of this telephone would be arriving, revealed the user of this phone to be Calvin TRUONG. A records check of the subscriber address revealed that this was a previous address for Calvin TRUONG's family.

48. On April 19, 2007, an administrative subpoena was served on T-Mobile for telephone number (916) 420-8104. T-Mobile records indicated the subscriber of this telephone number was Mai T Huynh, 8930 White Star Way, Elk Grove, California. The subscriber is believed to be Quincy HUYNH's mother and it is believed that Quincy HUYNH, is the user of this phone. Quincy HUYNH currently resides at the subscriber address with his family.

November 30, 2007 – 6:19 P.M. – **Call #2000**

49. Target Telephone #1 placed an outgoing call to telephone number (916) 753-2877. CAM asked TRUONG if he had money for gas. TRUONG said no and CAM told him to come over to CAM's residence.

50. Surveillance units were already in place at CAM's residence, 5911 Deepdale Way, Elk Grove, California, when this call was intercepted. Your affiant believed that CAM was sending TRUONG to pick something up and therefore was paying for the gas. Surveillance observed TRUONG arrive at CAM's residence a short time later. Surveillance units were instructed to follow TRUONG when he departed CAM's residence.

November 30, 2007 – 7:03 P.M. – **Call #2002**

51. Target Telephone #1 placed an outgoing call to telephone number (415) 321-0566. During the call, CAM told KAN "big brother" won't get there until 8:30 or 9:00. KAN told CAM to have "him" call KAN. KAN asked if "he" knew how to get to KAN's place. CAM told KAN that he told "him" to go to the Chevron gas station on Grand Ave. KAN said ok and asked what car "he" would be driving. CAM was heard asking someone (believed to be TRUONG) in the background what car he was driving. CAM said "Integra".

52. Your affiant believes that CAM was arranging for TRUONG to meet KAN to pick-up the "kids". It is believed that CAM asked TRUONG what kind of car he was driving. CAM told KAN that "he" would be driving an "Integra".

November 30, 2007 – 7:31 P.M. – **Call #2003**

53. Target Telephone #1 received an incoming call from telephone number (916) 420-8104. HUYNH asked CAM if he (HUYNH) was supposed to leave at 8:00. CAM told HUYNH it didn't matter, 7 or 8. CAM told HUYNH "Lego" was with CAM. CAM told HUYNH that "Lego" would pick HUYNH up. CAM invited HUYNH over for pizza but HUYNH said he was running errands. CAM asked if "Lego" should go alone. HUYNH said no.

8

54. Your affiant is aware that "Lego" is TRUONG's nickname based on intercepted calls and surveillance. Also, surveillance observed TRUONG arrive at CAM's residence and he was still there during this call. Your affiant believes that CAM had previously arranged to have HUYNH and TRUONG go to Oakland to meet KAN and pick-up the "kids".

55. Surveillance observed TRUONG depart CAM's residence at approximately 7:56 P.M., driving a silver colored Lexus (CA License 4NXR158). TRUONG drove to his (TRUONG) residence, 5719 Muskingham Way, and went into the house.

56. At approximately 8:04 P.M., surveillance observed HUYNH arrive at TRUONG's residence driving a silver Acura Integra (CA License 5UIK098). Surveillance observed TRUONG and HUYNH get into HUYNH's vehicle and depart the residence at approximately 8:05 P.M.

November 30, 2007 – 9:40 P.M. – **Call #2007**

57. Target Telephone #1 received an incoming call from telephone number (916) 753-2877. TRUONG asked CAM if the exit was "Grant". CAM told TRUONG the exit was "G-R-A-N-D". CAM asked if they were almost there and told TRUONG to call "him" (believed to refer to KAN).

58. At approximately 9:44 P.M., surveillance observed HUYNH and TRUONG arrive at 701 MacArthur Blvd, Oakland, California. HUYNH parked his vehicle directly behind a light colored Lexus (CA License 4DRY600). This residence was previously identified by law enforcement as KAN's residence and the Lexus is registered to KAN. HUYNH and TRUONG were observed entering KAN's residence at approximately 9:45 P.M.

59. At approximately 9:46 P.M., TRUONG and HUYNH were observed exiting KAN's residence. TRUONG was carrying a small white box which was inside a white plastic bag. TRUONG placed this box in the trunk of HUYNH's vehicle. The vehicle departed the area.

November 30, 2007 – 10:28 P.M. – **Call #2017**

60. Target Telephone #1 received an incoming call from telephone number (916) 753-2877. TRUONG asked CAM where CAM wanted TRUONG to drop "it" off. CAM told TRUONG at the "restaurant".

61. Your affiant is aware, based on previously intercepted calls and surveillance, the "restaurant" likely referred to 5926 Stacy Avenue, Sacramento, California. It is believed that CAM was in the process of setting up a marijuana grow house at this location during this period of interception. Surveillance units have observed TRUONG and HUYNH at this location at times when they have said they were at the "restaurant".

62. At approximately 11:28 P.M., surveillance observed HUYNH and TRUONG arrive at 5926 Stacy Avenue, Sacramento, California. TRUONG and HUYNH entered the residence. TRUONG carried the white box into the residence, aka "the restaurant".

9

63. At approximately 11:43 P.M., HUYNH and TRUONG were observed leaving the residence without the white box. Both individuals departed the area in HUYNH's vehicle.

**February 13, 2008 - Conspiracy to Distribute 20,000 pills of Ecstasy**
**Thau Benh CAM**
**Tan Quoc TO**
**Vinh Van VO**
**Arthur Lao Fong LO**

64. On January 15, 2008, an administrative subpoena was served on Cellco Partnership dba Verizon Wireless for telephone number (707) 951-1851. Cellco Partnership dba Verizon Wireless provided call detail records for this phone number but never provided subscriber information. It is unclear if there is a subscriber to this phone or if this phone is a pre-paid type of phone that doesn't require subscriber information. However, based on intercepted calls in which CAM talked to other individuals about calling "Arthur" and then called the user of this phone, your affiant believes that Arthur LO is the user of this phone number. Surveillance has observed LO arrive at CAM's residence at the same time that the user of this phone number has called CAM to advise that he had arrived at CAM's location.

February 10, 2008 – 10:04 P.M. – **Call #1803**

65. Target Telephone #2 received an incoming call from telephone number (707) 951-1851. LO asked CAM if he could get "10 CDs". CAM said yes and asked LO when he wanted them. LO said Tuesday.

66. Your affiant is aware, based on previously intercepted calls not documented in this affidavit, that "CDs" is a code word for ecstasy. It is believed that "10 CDs" likely referred to 10 "boats" of ecstasy. A boat is 1000 pills, thus 10,000 ecstasy pills.

67. During an intercepted phone call on January 18, 2008, Tan TO identified himself as the user of telephone number 850-524-2706. CAM asked the caller "is this T?" Caller replied "This is Teezy". "Teezy" is a known nickname for TO. Surveillance observed TO arrive at CAM's residence after a call was received from this number with the caller stating that they were at CAM's residence.

February 10, 2008 – 10:12 P.M. – **Call #1805**

68. Target Telephone #2 placed an outgoing call to telephone number (850) 524-2706. TO answered the phone and CAM asked him if "Yao" (nickname of Vinh VO) was with him. TO said yes. CAM asked to speak to him. CAM asked VO what was going on. VO said that he was still trying to get his money together. CAM asked "you ain't go get it yet?" VO said not yet. VO asked "he still has it though, right sir?" CAM told VO that he better talk to "him" and told VO to tell "him" to save CAM "10" and to save them whatever they needed. CAM told VO to call "him" before it's all gone.

69. Your affiant believes that "him" likely referred to CAM's ecstasy supplier. It is believed that CAM had previously instructed VO to make contact with the supplier to pick-up some ecstasy. CAM seemed annoyed that VO had not gone to pick-up the ecstasy already. CAM instructed VO to call the supplier and have the supplier save "10" for CAM. It is believed that "10" likely referred to the 10 boats that LO asked for in call #1803.

February 12, 2008 – 6:01 P.M. – **Call #1828**

70. Target Telephone #2 placed an outgoing call to telephone number (707) 951-1851. CAM told LO that the price of the "CDs" was "270". LO said ok. CAM confirmed that LO wanted "10".

71. Your affiant believes that CAM called to tell LO that the price of the ecstasy ("CDs") was $2.70 per pill. This is a higher price than CAM had told LO in previous calls, not specifically documented in this affidavit. CAM wanted to determine if LO was ok with the higher price and then reaffirmed that LO still wanted to buy 10 boats or 10,000 pills. Due to the limited scope of this affidavit, it should be noted that not all calls between CAM and his supplier were not specifically documented in this affidavit. The call documented in paragraphs 77-78 below demonstrates that CAM was the broker of the ecstasy deal between his [CAM's] subordinates and the supplier in Oakland.

72. On January 15, 2008, an administrative subpoena was served on Metro PCS for telephone number (916) 271-5950. Metro PCS indicated the subscriber of this telephone number was John Doe, 2400 Florin Road, Sacramento, California. Based on surveillance and the caller being identified as "Yao" (known nickname of VO), it was determined that Vinh VO was the user of this telephone.

February 12, 2008 – 6:03 P.M. – **Call #1829**

73. Target Telephone #2 placed an outgoing call to telephone number (916) 271-5950. CAM told VO that the "CD" was "24". VO asked if the supplier had it available at that time. CAM told VO that he had already placed an order. CAM told VO "the most I can drop it to you is 23, I gotta make a dime at least, ok?" VO said ok and that he would call CAM back.

74. Your affiant believes that "24" and "23" likely referred to $2.40 per pill and $2.30 per pill, respectively. CAM likely offered the ecstasy to VO at a lower price because VO is one of CAM's main distributors. It is believed that "make a dime" indicates that CAM wanted to make a profit of 10 cents per pill purchased by VO.

February 13, 2008 – 5:11 P.M. – **Call #1900**

75. Target Telephone #2 placed an outgoing call to telephone number (850) 524-2706. CAM asked TO how many "CDs" he wanted. TO said he would probably get "3". CAM told TO that the supplier was charging CAM "220". TO asked "how much I gotta give you back?" CAM asked if he (CAM) charged "240" would "you guys" make any money. TO said he didn't know. CAM told TO that the "CDs" would be ready in a few hours.

76. Your affiant believes that "3" likely referred to 3 boats or 3000 pills.  It is believed that "220" and "240" likely referred to $2.20 per pill and $2.40 per pill, respectively.  It is believed that CAM worked out a price of $2.20 per pill from the supplier and wanted to charged TO $2.40 per pill, in order to make 20 cents profit per pill.  CAM asked if "you guys", likely referring to TO and VO, would make money at that price.  It is believed that TO and VO are CAM's primary distributors of ecstasy.

<u>February 13, 2008 – 7:53 P.M. – **Call #1930**</u>

77. Target Telephone #2 received an incoming call from telephone number (510) 688-6580, subscribed to Lawrence Ellison (believed to be a fictitious name).  The supplier told CAM that the pills were "all women" and told CAM to tell his people to come over.  The supplier asked CAM "you are taking 16 all together, right?"  CAM indicated that was correct.  CAM told the supplier to "divide into 2".  CAM further stated "Arthur" would take "10" and "they" will take "6".  The supplier said "Arthur Lo…so your kid will take it all and give it to Arthur, right?"  CAM said no that they would come separately.  The supplier asked if "Arthur" would look for him.  CAM said yes and said that he (CAM) would call the supplier.  The supplier told CAM that he (the supplier) was in Chinatown.

78. Your affiant believes that "all women" was a reference to the stamp on the ecstasy pills.  Many of the pills purchased in this investigation during controlled buys had a stamp of a woman on them.  It is believed that "16" likely referred to 16 boats or 16,000 pills of ecstasy.  CAM told the supplier to divide the "16" into two groups because "Arthur", believed to be Arthur LO, would pick up "10" and the "6" would be picked up by TO and VO.  It is believed that when CAM said "they" he (CAM) was referring to TO and VO.

79. Additional calls were intercepted in which CAM told LO, TO and VO what time the ecstasy would be available from the supplier on February 13, 2008.  Based on those intercepted calls, LO was going to pick-up 10 boats of ecstasy alone.  TO and VO were going together to pick-up 6 boats of ecstasy.  Both groups were instructed by CAM to go to Oakland Chinatown to meet the supplier and pick-up their respective purchases.

80. On February 13, 2008, at approximately 10:25 P.M., surveillance observed LO arrive in the vicinity of 9th Avenue and Franklin Street in Oakland driving a dark colored Chrysler 300, Colorado plate 172 MXE.

81. Calls between CAM and LO were intercepted, at the same approximate time, in which CAM was directing LO where to go to make the pick-up.

82. Surveillance observed LO meet with the supplier at the entrance of 989 Franklin Street.  LO was given a white colored bag with a square or rectangular object inside approximately 12 to 15 inches in length and 12 to 15 inches in width.  LO walked back to his vehicle and placed the bag into the trunk.  LO got back into his vehicle and left the area.  Note: See LO's criminal history in paragraph 150 for LO's prior ecstasy arrest.

February 13, 2008 – 10:36 P.M. – **Call #1958**

83. Target Telephone #2 placed an outgoing call to telephone number (707) 951-1851. CAM asked LO "you got it?" LO said yes. LO and CAM discussed when LO would be traveling to the Denver area.

84. Your affiant believes that CAM wanted to make sure that LO had received the 10 boats of ecstasy from the supplier. Surveillance observed LO leaving the area at approximately 10:28 P.M. At the time of this call, LO was already on his way back to Sacramento after having received the bag likely containing ecstasy.

85. At approximately 10:38 P.M., CAM talked to TO to determine when TO and VO would be going to Oakland to pick-up the ecstasy. TO indicated that he and VO were on their way at that moment. Surveillance attempted to follow TO and VO but lost them shortly after they left TO's residence.

86. At approximately 11:54 P.M., CAM called TO. TO told CAM that they (TO and VO) were almost to the Oakland area. CAM told them to "drive safe".

87. It is believed that TO and VO likely went to the same location in Oakland that LO was observed picking up the ecstasy from earlier in the evening. It is believed that TO and VO drove directly to Oakland, based on the amount of time that passed between TO and VO leaving Sacramento and when CAM talked to them at approximately 11:54 P.M.

February 15, 2008 – 12:25 A.M. – **Call #2015**

88. Target Telephone #2 placed an outgoing call to telephone number (850) 524-2706. CAM asked TO "you got my six?" TO said "the six?" CAM said "yes, my six hundred." TO said that he had picked up "5". CAM asked how many "Yao" picked up. TO said "5". TO told CAM that he thought he (TO) was supposed to give CAM "a dime". CAM said that was fine and said "I'll take a dime". TO told CAM that he would have the money for CAM the next day.

89. Your affiant believes that CAM was attempting to collect the money he was owed for the ecstasy that TO and VO had picked up on February 13, 2008. Based on previously intercepted calls, TO and VO were supposed to pick-up 6 boats of ecstasy. CAM had previously told them that he (CAM) would only charge them 10 cents per pill (a dime), which results in $100 per boat. It is believed that CAM called to get the $600 owed. However, TO informed CAM that he (TO) had picked up 5 boats and VO (aka Yao) had pick-up 5 boats.

February 15, 2008 – 1:39 P.M. – **Call #2016**

90. Target Telephone #2 received an incoming call from telephone number (850) 524-2706. TO told CAM that he had the money for CAM. CAM asked TO if he had "Yao's" money too. TO said no. CAM asked TO to "collect" from "Yao" and bring him (CAM) the money. TO said ok.

91. Your affiant believes that CAM wanted TO to collect VO's, aka Yao, money prior to bringing CAM the money.

February 15, 2008 – 1:49 P.M. – Call #2017

92. Target Telephone #2 received an incoming call from telephone number (850) 524-2706. TO told CAM that VO was asleep. CAM told TO to drop off his money. TO asked "I'm supposed to give you back five or, or one for it". CAM said "five will be fine...a dime difference." TO said he was on the way.

93. Your affiant believes that "five" and "one" likely referred to $500 and $1000, respectively. CAM told TO that $500 would be fine. It is believed that VO owes CAM $500 as well.

94. Based on the intercepted calls and surveillance, it is believed that CAM arranged for the distribution of 20,000 pills of ecstasy on February 13, 2008. LO picked up 10,000 pills and TO and VO picked up 10,000 pills, as well. CAM made a profit of $1000 on the pills that TO and VO bought because CAM only increased the price by 10 cents per pill. However, it is believed that CAM charged LO $2.70 per pill, an increase of 50 cents per pill, thus making a profit of $5000 on LO's purchase.

## Controlled Purchases of Ecstasy from Peter TRUONG and Tan TO

95. In May 2007, Yolo County Narcotic Enforcement Team (YONET) began investigating some ecstasy trafficking occurring in Yolo County. An undercover officer (UC) was able to purchase small amounts of ecstasy from an individual on multiple occasions. After one of these occasions, YONET arrested the individual on distribution charges. The individual, hereafter referred to as CS-1, agreed to cooperate in exchange for assistance with his/her charges. Prior to this arrest, CS-1 had no criminal history. CS-1 was deemed reliable based on information CS-1 provided being corroborated by law enforcement and based on law enforcement observations of CS-1 during controlled buys.

96. The drug purchases detailed below occurred prior to CS-1 being arrested. However, in order to protect CS-1's identity, his/her name is not being used.

## June 12, 2007 – Controlled Purchase of 460 Ecstasy Pills from Peter TRUONG and CS-1

97. On June 12, 2007, an undercover officer at YONET arranged to purchase 550 ecstasy pills from CS-1 for $2000. CS-1 met with a UC in a predetermined location in West Sacramento. After meeting with the UC, CS-1 called his/her supplier. CS-1 told the UC that the supplier was approximately 10 minutes away.

98. Approximately 20 minutes later, surveillance observed a black 1998 Mercedes (CA license 4WZG819) arrive at the buy location. CS-1 went over to talk to the occupants of the Mercedes. CS-1 returned to the UC's vehicle and sold the UC, what was later determined to be, 460 ecstasy pills for $2000.

99. The Mercedes was registered to Thi or Leslie Huynh, 9744 Westfalen Way, Elk Grove, California. Further investigation revealed that Peter TRUONG resided at that location. The UC was shown a Department of Motor Vehicles (DMV) photo of TRUONG. The UC positively identified TRUONG as the driver of the Mercedes and the individual with whom CS-1 was dealing with when he/she obtained the ecstasy pills.

100. Immediately following the drug buy, surveillance attempted to follow the Mercedes, however, they lost sight of the vehicle in the area of TRUONG's residence on Westfalen Way.

## July 23, 2007 – Controlled Purchase of 979 Ecstasy Pills from Peter TRUONG, Tan TO and CS-1

101. On July 23, 2007, YONET arranged to purchase 1000 pills of ecstasy from CS-1. The UC met CS-1 in the area of Calvine Road and Power Inn Road in South Sacramento. The UC and CS-1 waited for TRUONG to arrive with the ecstasy pills. Approximately 15 minutes later, TRUONG was observed driving the same black Mercedes as seen during the drug transaction on June 12, 2007.

102. CS-1 met with TRUONG and an unidentified Asian male passenger, later identified as Tan TO, in TRUONG's vehicle. Surveillance observed CS-1 place an item in his waistband area and return to the UC's vehicle. CS-1 provided the UC with the ecstasy, later determined to be 979 ecstasy pills, and exited the vehicle.

103. Surveillance followed TRUONG as he departed the buy location. TRUONG and TO were observed going into a supermarket. A short time later, they returned to the Mercedes and departed the area. Surveillance observed TRUONG drop off TO in the area of Euler Way and Clove Court in Elk Grove. Surveillance followed TRUONG to his residence, 9744 Westfalen Way, Elk Grove. Surveillance observed the garage door open as the vehicle arrived. TRUONG pulled the vehicle into the garage and closed the garage door. Surveillance later observed TRUONG open the front door of the residence, look around and close the door.

## Conspiracy to Distribute Marijuana and Distribution of Marijuana
### Thau Benh CAM
### Bang Thai TANG
### Tan Quoc TO
### Arthur Lao Fong LO

104. On multiple occasions, during the authorized interception of Target Telephone #2, marijuana conversations between TANG and CAM were intercepted. Surveillance observed

TANG arrive at locations to distribute the marijuana, either to CAM or CAM's associates, such as LO or TO. Due to the limited scope of this affidavit, only a portion of these intercepted calls and surveillances have been documented here.

105. On January 15, 2008, an administrative subpoena was served on AT&T Wireless for telephone number (916) 761-7806. AT&T records indicated that this is a pre-paid phone and does not require subscriber information. Based on surveillance and the caller being identified as "Thai" (TANG's middle name), it was determined that Bang TANG was the user of this telephone.

#### January 12, 2008 - 5lb Marijuana deal involving TANG, CAM and TO

106. On January 12, 2008, during an intercepted call, TANG told CAM that his marijuana supplier would be getting rid of everything that day. CAM called TO to find out if TO wanted anything. TO wanted CAM to have some held for TO for a few days. The following calls occurred after these.

#### January 12, 2008 – 3:32 P.M. – Call #287

107. Target Telephone #2 placed an outgoing call to telephone number (916) 761-7806. CAM asked TANG if he (TANG) could hold "5". TANG said no and indicated that the supplier wanted to get rid of everything that day. TANG told CAM that the supplier had "16" left. CAM asked if it was "GD". TANG said yes and later said "it's really dark, its like, darkest one". CAM asked TANG if he would be going out of town that night. TANG said he wanted to try to get rid of the "green". TANG said "it's like freaking 40, I could use that money".

108. Your affiant believes "5" and "16" likely referred to 5 pounds of marijuana and 16 pounds of marijuana, respectively. It is believed that "GD" likely referred to Granddaddy, a known strain of marijuana. Your affiant is aware that marijuana with more color seems to be more desirable to buyers. It is believed that that is why TANG told CAM "it's really dark". It is believed that TANG had some "green" marijuana for sale as well, however, it was not selling well. Your affiant believes that "40" likely referred to 40 pounds of "green" marijuana.

109. CAM immediately called TO to find out if TO wanted 5 pounds of marijuana that day. CAM explained to TO that if he (TO) did not buy any marijuana that day, that it would be gone and nothing would be available again for a few weeks. TO told CAM that he could probably get it that night but that he (TO) needed to go home and get organized.

#### January 12, 2008 – 3:36 P.M. – Call #289

110. Target Telephone #2 placed an outgoing call to telephone number (916) 761-7806. CAM told TANG to bring him (CAM) "5". TANG told CAM to give him two hours.

111. Your affiant believes that CAM told TANG to bring 5 pounds of marijuana over to his (CAM's) house.

112. Approximately 2 hours and 15 minutes later, surveillance observed TANG arrive at CAM's residence. TANG was observed removing a large box from the trunk of his vehicle. TANG took this box into the residence.

113. Within 5 minutes of TANG's arrival at CAM's residence, an outgoing call (call #300) from CAM to TO was intercepted. CAM asked TO when TO would be coming over. TO said it would be an hour. CAM told TO that "the guy" (TANG) was there at that time.

114. At approximately 7:13 P.M., TO arrived at CAM's residence. Surveillance observed TO enter CAM's residence and exit approximately 6 minutes later carrying the same box that TANG took into CAM's residence earlier in the evening. Surveillance observed TO place the box in the trunk of his vehicle. TO got into his vehicle and departed the area.

115. At approximately 7:30 P.M., surveillance followed TO to his residence, 8700 Festival Drive, Elk Grove, California. TO was seen going into the house but did not remove the box from the trunk of his vehicle.

116. At approximately 8:00 P.M., surveillance observed TANG exit CAM's residence and return to his vehicle. TANG was followed from CAM's residence back toward his residence, 9611 Pilliteri Way, Elk Grove, California. TANG lives in a gated community that requires a code to open the gate. Surveillance followed TANG until he stopped at the gate to enter his code. Surveillance did not attempt to follow TANG into the community at that time in order to avoid detection. Surveillance went into the community at a later time to verify that TANG had arrived at his residence. TANG's vehicle was parked on the street in front of the residence.

117. At approximately 8:51 P.M., surveillance observed the garage door open half-way at TO's residence. Surveillance observed TO go to his vehicle and remove the box from the trunk of the car. TO carried the box into the garage and closed the garage door.

## January 24, 2008 - 4lb Marijuana deal involving TANG, CAM and LO

### January 23, 2008 – 10:50 P.M. – Call #878

118. Target Telephone #2 received an incoming call from (707) 951-1851. LO asked CAM if he (LO) picked up "3" whether or not "the guy" would give LO a "couple more of the videos". CAM told LO that everything was COD. LO said ok and said "I'll be down tomorrow". CAM said he would talk to "my guy" to see what he wanted to do.

119. Your affiant believes that "3" likely referred to 3 pounds of marijuana. It is believed that "the guy" likely referred to TANG. Based on previously intercepted calls, "videos" are a code word for marijuana. It is believed that when LO said "I'll be down tomorrow", he meant that he would be coming to Sacramento from Crescent City, California, which is on the northern coast of California. Surveillance followed LO to his residence in Crescent City on a previous surveillance.

17

120. On January 24, 2008, during an intercepted call at approximately 10:06 P.M., CAM asked LO to come over to his house. Surveillance observed LO arrive at CAM's residence at approximately 10:24 P.M.

January 24, 2008 – 10:56 P.M. – **Call #941**

121. Target Telephone #2 received an incoming call from telephone number (916) 761-7806. TANG told CAM that he (TANG) had to "throw back 4 to that guy". CAM asked TANG how much TANG had for him (CAM). TANG said he only had "4" left. CAM said that was fine. TANG asked CAM if he wanted the "4". CAM said yes.

122. Your affiant believes that "4" likely referred to 4 pounds of marijuana. It is believed that TANG had to give 4 pounds back to his supplier and only had 4 pounds left. CAM told TANG that he would take the remaining 4 pounds.

123. Surveillance observed TANG arrive, in an SUV, at CAM's residence at approximately 11:14 P.M. TANG removed a package from the rear of the SUV and take it inside of CAM's residence.

124. At approximately 11:18 P.M., LO was observed exiting CAM's residence carrying the package that TANG had taken inside minutes earlier. LO placed this package in the trunk of his vehicle and departed the area.

January 24, 2008 – 11:22 P.M. – **Call #945**

125. Target Telephone #2 placed an outgoing call to telephone number (707) 951-1851. CAM told LO "make sure nobody follow you". CAM told LO to call him when he (LO) got home so that he (CAM) knows LO is ok. LO agreed.

126. Your affiant believes that CAM was worried that LO might get followed by law enforcement and wanted to warn him.

127. Surveillance observed LO arrive at his residence, 7911 Deer Creek, Sacramento, California at approximately 11:26 P.M. A call from LO to CAM was intercepted at approximately 11:29 P.M. LO told CAM that he had arrived home safely.

## May 26, 2008 - Arrest of TO and Reutha YUN with 5000 pills of Ecstasy

128. Your affiant has reviewed approximately 10 intercepted calls between TO and the ecstasy supplier in Oakland, California. These calls were intercepted in the days prior to TO's arrest on May 26, 2008. During these intercepted calls, TO was attempting to determine when the ecstasy would be available and what designs were on the pills.

129. On May 26, 2008, at approximately 7:59 P.M., surveillance observed TO arrive in the area of 989 Franklin, Oakland, California. TO was driving a dark grey Acura TL (CA license

5HUF896) and Reutha YUN was the passenger in the vehicle. The vehicle parked in a parking garage at 989 Franklin.

130. At approximately 8:03 P.M., surveillance observed TO and YUN enter the building at 989 Franklin. At approximately 8:08 P.M., TO and YUN exited the building. Surveillance observed that TO was carrying a dark colored back pack. TO and YUN returned to the parking garage.

131. At approximately 8:10 P.M., surveillance observed TO and YUN leave the parking garage in the Acura TL (CA license 5HUF896). TO was driving the vehicle.

132. At approximately 8:15 P.M., TO and YUN's vehicle was stopped by an Oakland Police Department (OPD) marked unit. Surveillance observed TO get out of the vehicle. Surveillance was terminated shortly after the vehicle was stopped.

133. The following information was obtained from OPD police reports regarding the stop of the vehicle.

134. OPD made contact with TO to determine if the driver had been drinking because the vehicle had swerved into oncoming traffic prior to making the stop. The officer asked TO and YUN if they had been drinking and they said no. The officer asked TO if he could search the vehicle for alcohol or weapons and TO said "Go ahead! We got nothing!" TO and YUN stood at the rear of the vehicle while the officer conducted his search. The officer located a loaded "Smith & Wesson" revolver in the front passenger door's side compartment. At this time, TO and YUN were handcuffed for officer safety.

135. The officer continued to search the vehicle and discovered a black back pack in the trunk of the vehicle, which smelled of marijuana. The officer looked inside the back pack and discovered a gallon size plastic ziplock bag containing clear sandwich bags with approximately 5000 red, light blue, and orange pills, believed to be ecstasy. Next to the ecstasy was a red apron with a "WDS" name tag with the name "Reutha". Inside the front pocket of the back pack was a "Tightvac" clear bottle, with a yellow lid, that contained a green leafy substance believed to be marijuana.

136. OPD arrested TO and YUN for possession of a controlled substance for sales, transport of a controlled substance and possession of a controlled substance while armed with a loaded firearm.

137. OPD searched TO and discovered approximately $1,400 in his right front pants pocket. TO told the officer that he was unemployed and had been so for approximately one year.

138. YUN advised that he was employed as a food server at Warehouse Demo Services (WDS), aka Costco. Note the red apron in the back pack said "WDS" and had a name tag with YUN's first name, Reutha.

139. While being processed at the jail, TO and YUN both stated that they were affiliated with the street gang, HOP SING.

140. The Drug Enforcement Administration (DEA) Western Regional Lab (WRL) later tested the pills/substance seized from TO and YUN on May 26, 2008. The WRL analysis indicated that the pills/substance seized from TO and YUN was MDMA HCL.

## Search Warrants Issued During Investigation

141. On January 18, 2008, the Honorable Gregory G. Hollows, United States Magistrate Judge, Eastern District of California, signed search warrants authorizing the search of text messages stored in the memory of any server maintained by Cellco Partnership dba Verizon Wireless for the period of January 10, 2008 through January 14, 2008 for telephone number (916) 599-4333 (Target Telephone #2) (08-SW-0028-GGH) and telephone number (707) 951-1851 (Arthur LO's phone) (08-SW-0029-GGH).

142. These search warrants were sought because of a series of calls intercepted on January 14, 2008. During those calls, CAM told LO "put 3 in mine" and in a later call CAM told LO "just put in 4". LO asked CAM "did you text me the information?" CAM said yes.

143. Your affiant believed that CAM was instructing LO to put money into CAM's account. I believe that "3" likely referred to $3000 and that CAM later changed the amount to "4" ($4000). I believe that LO had requested CAM's bank account information in order to make the deposit.

144. The execution of the search warrant revealed that CAM sent LO the following text message: "3743789973". Further investigation revealed that this number is an account number at Washington Mutual Bank belonging to Thau B. CAM.

145. On February 8, 2008, the Honorable Kimberly J. Mueller, United States Magistrate Judge, Eastern District of California, signed a search warrant authorizing the search of text messages stored in the memory of any server maintained by Cellco Partnership dba Verizon Wireless for the period of February 4, 2008 through February 5, 2008 for telephone number (916) 599-4333 (Target Telephone #2) (08-SW-0062-KJM).

146. This search warrant was sought because intercepted calls revealed that CAM needed to pay rent for the suspected marijuana grow house located at 5926 Stacy Avenue, Sacramento, California. Your affiant believes that the owner of the house, Nhi Le Huynh, was aware that CAM was using the residence as a marijuana grow house based on intercepted calls. One example was when Nhi Le Huynh's husband, Leon Kwan, called CAM to tell him [CAM] to clear out the Stacy Avenue suspected marijuana grow house because the police might discover it. During a call on February 4, 2008, an unknown female (now identified as Nhi Le Huynh) asked CAM if he had received her text message. CAM said yes and asked "it is Washington Mutual, right? Same as last time, right?".

147. Your affiant believed that Huynh and her husband, Leon Kwan, were involved in the suspected marijuana grow operation and wanted to verify that this caller was indeed Huynh by obtaining the bank account information sent in the text message.

148. The execution of the search warrant revealed that Huynh sent CAM the following text message: "0933576144 Washington Mutual". Further investigation into the account number revealed that this account belonged to Nhi Le Huynh, Leon Kwan and Git Hing Kwan. A cash deposit was made into this account on February 5, 2008 in the amount of $1,250. This amount is consistent with amounts CAM has indicated, during intercepted calls, that he (CAM) paid for the location.

## Criminal Histories

**Thau Benh CAM** (utilized Target Telephone #1 and #2 throughout this investigation)

149. Your affiant has personally reviewed the criminal history of Thau Benh CAM (DOB: 03/06/1979, CDL: B6800202, CII: A11843092). In 1997, CAM was arrested for violations of 12025 (A) (1)-Carry Concealed Weapon in Vehicle (no disposition) and 12031 (A) (1)-Carry Loaded Firearm in Public (no disposition). Your affiant personally reviewed the Sacramento County Known Persons File (hereafter referred to as KPF) records pertaining to CAM. KPF records list an address of 5911 Deepdale Way, Elk Grove, California in May 2003.

## Arthur Lao Fong LO

150. Your affiant has personally reviewed the criminal history of Arthur Lao Fong LO (DOB: 01/10/1986, Colorado DL: 000341097; Colorado State ID: 2114967). On July 28, 2007, Arthur LO was arrested while in possession of approximately 10,500 pills of ecstasy (MDMA). It is believed that CAM had shipped the MDMA to LO via Fed-Ex. LO was arrested just after the Fed-Ex package was delivered.

## Bang Thai TANG

151. Bang Thai TANG (DOB: 02/19/1984; CDL: D7638387) has no known criminal history.

## Quintilian Minhquan HUYNH (aka Quincy)

152. Quintilian Minhquan HUYNH (DOB: 08/25/1987; CDL: D8270909) has no known criminal history. KPF records list an address of 8930 White Star Way, Elk Grove, California in August 2006. It should further be noted that KPF records indicate that HUYNH was contacted by law enforcement in September 2007 while in the company of known Hop Sing Associates.

**Vinh Van VO**

153. Your affiant has personally reviewed the criminal history of Vinh Van VO (DOB:11/18/1987; CDL: D5840793; CII: A28449287). On June 20, 2007, VO was arrested for violation of 11378 HS-Possession of Controlled Substance for Sale (convicted). On October 10, 2007, VO was arrested for violations of 11359 HS- Possession of Marijuana for Sale (dismissed) and 11360 (A) HS –Sell/Furnish/Etc Marijuana (convicted). The two convictions (felony) resulted in VO receiving 365 days in jail with the remainder of his sentence suspended. VO reported to jail on April 16, 2008 to begin serving the 365 day sentenced. VO is on full searchable probation until March 2012.

**Calvin TRUONG**

154. Your affiant has personally reviewed the criminal history of Calvin TRUONG (DOB: 08/06/1989; CDL: D8666043; CII: A28452987). On June 21, 2007, TRUONG was arrested for violations of 12025 (B) (1)-Carry Concealed Weapon in Vehicle with a Prior Felony Conviction (no disposition) and 12031 (A)(2)(F) – Carry Loaded Firearm and not the registered owner (no disposition) and 11357 (B) HS-Possession of Marijuana (no disposition). Though no disposition could be determined for these charges, it is believed that TRUONG, who was a juvenile at the time, received probation. TRUONG is currently on Juvenile Probation until August 2010. KPF records list an address of 4500 Natomas Central Drive, Apt. 1031, Sacramento, California in January 2008.

**Tan Quoc TO**

155. Your affiant has personally reviewed the criminal history of Tan Quoc TO (DOB: 04/06/1987; CDL: D4573062; CII: A25670874). In 2004, TO was arrested for violation of 484 (A)- Petty Theft (Juvenile Hall and Probation). In 2005, TO was arrested for violation of 653K – Possession of a Switch Blade Knife (dismissed). In 2006, TO was arrested for violation of 602 WI – Fail to Obey Order of Juvenile Court (no disposition). On May 26, 2008, TO was arrested while in possession of approximately 5000 pills of ecstasy (MDMA) and carrying a concealed weapon in a vehicle. TO was with Reutha YUN at the time of this arrest. Further information regarding this arrest was documented in paragraphs 128-140. KPF records indicate that TO was documented as a Hop Sing Associate in January 2007.

**Vincent Kwok Hung KAN**

156. Your affiant has personally reviewed the criminal history of Vincent Kwok Hung KAN (DOB: 02/26/1982; CDL: B8623943; CII: A12041909). In 1997, KAN was arrested for violation of 496 (A) – Receive/Etc Known Stolen Property (Juvenile Hall). In 1999, KAN was arrested for violation of 211 PC – Robbery (Juvenile Hall). KPF has no records pertaining to KAN.

**Peter Duc TRUONG**

157. Your affiant has personally reviewed the criminal history of Peter Duc TRUONG (DOB: 05/30/1987; CDL: D5570030; CII: A25570006). In 2004, TRUONG was arrested for violations of 10851 (A) – Vehicle Theft (Juvenile Hall Wardship) and 496 (D) – Attempt to Receive Stolen Property (no disposition). In 2005, TRUONG was arrested for violations of 626.8 PC –Disrupt School Activities (no disposition) and 415.5 (A)(1) – Fight (Wardship). KPF records list an address of 9744 Westfalen Way, Elk Grove, California in May 2005. It is should be noted that KPF records in September 2007, indicate that TRUONG is known to associate with Hop Sing Associates.

**Reutha Rich YUN**

158. Your affiant has personally reviewed the criminal history of Reutha Rich YUN (DOB: 12/09/1987; CDL: D8668327; CII: A2754920). In 2006, YUN was arrested for violations of 496 (A) – Receive/Etc. Known Stolen Property (dismissed), 182 (A)(1) – Conspiracy (dismissed) and 10852 – Tamper with Vehicle (dismissed). In March 2007, YUN was arrested for violation of 23152 (B) – DUI (convicted). YUN received 36 months probation for this misdemeanor conviction. On May 26, 2008, YUN was arrested while in possession of approximately 5000 pills of ecstasy (MDMA) and carrying a concealed weapon in a vehicle. YUN was with Tan TO at the time of this arrest. Further information regarding this arrest was documented in paragraphs 128-140. KPF records document that YUN was contacted in October 2007 with known Hop Sing Associates.

**Tim TUYEN**

159. Your affiant has personally reviewed the criminal history of Tim TUYEN (DOB: 01/28/1974; CDL: A8130224; CII: A10766787). In 1994, TUYEN was arrested for violation of 519.1 PC – Extortion by Threat: Injury (dismissed). In 1996, TUYEN was arrested for violation of 459 PC – Burglary (convicted). TUYEN received 3 years probation for this misdemeanor conviction. In 1997, TUYEN was arrested for violations of 12025 (A)(1) – Carry Concealed Weapon in Vehicle (no disposition) and 12031 (A)(1) – Carry Loaded Firearm in Public Place (dismissed). It is believed that TUYEN and CAM were arrested together for this charge in 1997.

## Location Information

160. During the course of this investigation, several agents/officers took photographs depicting the residences and properties below. In addition, public database searches and other investigative efforts, to include surveillance, have been conducted to identify persons related to each residence/property. Your affiant has reviewed the photographs and other information to compose written detailed descriptions of the residences/properties. These descriptions are contained in Attachments A-1 through A-9 of this Affidavit. A summary of activities and surveillance information for each location/property is described briefly below, as well as a summary of activities revealed in this investigation relevant to each location:

**Eastern District of California:**

Attachment A-1: **5911 Deepdale Way, Elk Grove, California**
-Residence of **Thau Benh CAM**

161. During the time period that Target Telephone #1 and Target Telephone #2 was intercepted, CAM routinely set up for drug transactions to occur at this residence. Some of these transactions are detailed in paragraphs 104-127. There were other occasions that were not specifically documented in this affidavit. On June 30, 2008, Sacramento Municipal Utility District (SMUD) records indicated that Thau CAM is the utilities subscriber at this address. A lien report on this address indicated that CAM was the registered owner of the address until October 2007, when he deeded the property to Lydia Cam. It is believed that Lydia Cam is a relative of Thau Benh CAM. The California Department of Motor Vehicles (DMV) records indicate this is CAM's address. Further investigation revealed that CAM has a Washington Mutual Bank account and lists this address as his mailing address. A significant amount of surveillance was done of CAM at this address as recently as July 2, 2008.

Attachment A-2: **8700 Festival Drive, Elk Grove, California**
-Residence of **Tan Quoc TO**

162. During the time period that Target Telephone #1 and Target Telephone #2 were intercepted, TO was surveilled to and from this address before and after drug transactions. One of these instances was detailed in paragraphs 106-117. There were other occasions that were not specifically documented in this affidavit. On June 30, 2008, SMUD records indicated that Tinh Q To is the utilities subscriber at this address. Surveillance, as recently as July 2, 2008, observed TO at this address.

Attachment A-3: **9611 Pilliteri Way, Elk Grove, California**
-Residence of **Bang Thai TANG**

163. During the time period that Target Telephone #1 and Target Telephone #2 were intercepted, TANG was surveilled to and from this address before and after drug transactions. One of these instances was detailed in paragraphs 106-117. There were other occasions that were not specifically documented in this affidavit. On June 30, 2008, SMUD records indicated that Joanne Tseng is the utilities subscriber at this address. Your affiant is unsure of the specific relationship between TANG and Tseng, however, it is believed that Tseng is a relative of TANG. TANG has been observed driving a vehicle that has been registered to Tseng. A lien report on this address indicated that Tseng is the registered owner of this address. TANG's DMV records indicate this is his address. Surveillance observed TANG at this location as recently as July 9, 2008.

Attachment A-4: **5926 Stacy Avenue, Sacramento, California**
-Residence of **suspected marijuana grow house**

164. During the time period that Target Telephone #1 and Target Telephone #2 were intercepted, your affiant became aware that CAM was attempting to establish a marijuana grow house.

Extensive surveillance was done resulting in this address being identified as the suspected grow house. Surveillance observed CAM and his associates going to and from this location. Intercepted calls revealed that CAM instructed associates such as Calvin TRUONG and Quincy HUYNH to work in the grow house and care for the plants. One such instance was detailed in paragraphs 37-63. On June 30, 2008, SMUD records indicate that Ming HUYNH is the utilities subscriber at this address. A lien report on this address indicated that Nhi Le HUYNH and Chiu Fung Tseng were the registered owners of this address. Intercepted calls revealed that Nhi Le HUYNH was aware of the activities occurring at this address. Nhi Le HUYNH's spouse, Leon KWAN was intercepted assisting CAM with obtaining marijuana plants. A search warrant revealed that HUYNH provided CAM with her bank account number and had CAM put the rent money, for this location, directly into her account.

## Attachment A-5: **9744 Westfalen Way, Elk Grove, California**
## -Residence of **Peter Duc TRUONG**

165. Surveillance followed Peter TRUONG to this address after completing a drug transaction with an undercover officer. This instance was detailed in paragraphs 95-103. There were other occasions that were not specifically documented in this affidavit. On June 30, 2008, SMUD records indicated that Tung D Truong is the utilities subscriber at this address. TRUONG's DMV records indicate this is his address. Surveillance, as recently as July 2, 2008, observed TRUONG at this address.

## Attachment A-6: **7911 Deer Creek Drive, Sacramento, California**
## -Residence of **Arthur Lao Fong LO**

166. During the time period that Target Telephone #1 and Target Telephone #2 were intercepted, LO was surveilled to this address after drug transactions. One of these instances was detailed in paragraphs 118-127. There were other occasions that were not specifically documented in this affidavit. On June 30, 2008, SMUD records indicated that Stacie LO is the utilities subscriber at this address. Your affiant believes that Stacie LO is Arthur LO's sister. Arthur LO routinely stays at this location when he is in Sacramento.

## Attachment A-7: **8930 White Star, Elk Grove, California**
## -Residence of **Quintilian Minhquan HUYNH, aka Quincy**

167. During the time period that Target Telephone #1 and Target Telephone #2 were intercepted, HUYNH was observed arriving or departing this location during drug transactions. One such instance occurred during a surveillance of a drug transaction involving Calvin TRUONG. A source purchased ecstasy from TROUNG and immediately asked for additional ecstasy pills. TRUONG left the meet location and was followed by surveillance to this address. TRUONG entered the address, stayed only a few minutes and exited. TRUONG was followed directly back to the meet location and provided the source with the additional ecstasy. There were other occasions that were not specifically documented in this affidavit. On June 30, 2008, SMUD records indicated that Mai Huynh is the utilities subscriber at this address. Your affiant believes that Mai Huynh is Quincy HUYNH's mother. HUYNH's DMV records

indicate this is his address. HUYNH was observed at this location as recently as July 2, 2008.

## Northern District of California:

### Attachment A-8: 701 MacArthur Drive, Oakland, California
-Residence of **Vincent Kwok Hung KAN**

168. During the time period that Target Telephone #1 and Target Telephone #2 were intercepted, CAM and his associates were surveilled to this address during drug transactions. One of these instances was detailed in paragraphs 37-63. There were other occasions that were not specifically documented in this affidavit. Surveillance observed KAN at this address on multiple occasions. During intercepted calls, KAN referred to this location as his house when directing others to his location. Surveillance observed vehicles belonging to KAN at this address as recently as July 8, 2008.

### Attachment A-9: 1257 Huntington Street, Crescent City, California
-Residence of **Arthur Lao Fong LO**

169. During the time period that Target Telephone #1 and Target Telephone #2 were intercepted, CAM and LO were intercepted discussing LO's new place "up north". On January 18, 2008, surveillance units followed CAM, LO and TUYEN from Sacramento to this address. They arrived at the location at 12:30 A.M. Surveillance observed LO's Chrysler 300 (CO License 172MXF) already at the location when CAM, LO and TUYEN arrived. Note: This is the same vehicle LO used to pick-up 10,000 pills of ecstasy in Oakland, discussed in more detail in paragraph 80. Surveillance also observed a silver colored Honda CR-V (CA License 6AEP564). It is believed that this Honda CR-V is the same vehicle surveillance had previously associated with LO when LO lived in Sacramento, however, at that time the vehicle had a Colorado license plate. The vehicle is currently registered to Arthur LaoFong LO, 1257 Huntington St, Crescent City, California.

170. Intercepted calls revealed that LO was attempting to set up a marijuana grow house in a portion of this Crescent City residence and was having trouble with the power. Based on intercepted calls, CAM volunteered TUYEN's assistance to help LO with the power problem at LO's house. Based on intercepted calls, TUYEN had done all of the wiring in CAM's Sacramento grow house. Surveillance observed CAM, LO and TUYEN look at the breaker box at this residence. CAM and TUYEN stayed at this location approximately 2 hours and departed the location at approximately 2:30 A.M. LO remained at the location. Intercepted calls revealed that CAM and TUYEN drove all the way back to Sacramento. DMV records indicate that on March 3, 2008, Debra LEE, Arthur LO's girlfriend, changed her residence of record to this address. Employment checks reveal that LEE is working in the Crescent City area, however, no records for LO can be found. Further investigation revealed that LEE has a Washington Mutual Account in her name and lists this address on the account.

## Training and Experience

171.   Based upon my training and experience I have learned the following:

a.  Individuals involved in drug dealing often maintain at their residence, vehicles, and persons records and ledgers evidencing their trafficking activities in order to keep track of the ordering, purchasing, storage, distribution, and transportation of drugs. Even after the drugs are sold, documentary records and ledgers often remain for long periods of time to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators.  These records are often maintained not only on paper, but also as computer data in the form of computer hardware and software.

b.  Individuals involved in drug dealing must often rely on others to obtain the drugs and to help them market the drugs. Evidence of the identities of these co-conspirators is often maintained at their residence, in their vehicles, and on their persons.

c.  Individuals involved in drug dealing earn sums of money and often try to legitimize these profits.  In order to do this, they attempt to secrete, transfer, and conceal the money by, (among other methods):  (a) placing assets in names other than their own name to avoid detection while maintaining control; (b) laundering the money through what appear to be a legitimate business or businesses; (c) hiding the money in their homes, safes, and safety deposit boxes; or (d) using the money to buy assets which are hard to trace by law enforcement.  Records of these transactions are often found at their residence, in their vehicles, and on their persons.

d.  Individuals involved in drug dealing often maintain large amounts of U.S. currency on hand in order to finance their ongoing drug business.  In addition, other assets generated by their drug business, or purchased with cash earned, such as precious metals, and stones, and jewelry, are typically kept by drug dealers at their residence, in their vehicles, and on their persons to avoid detection by authorities.

e.  Individuals involved in drug dealing often maintain weapons, firearms, and ammunition on their person or at their residence and in their automobiles in order to protect themselves and guard their drugs and drug profits, and for enforcement purposes during their drug dealings.  These weapons and firearms are used and can be used as an instrumentality of the crime of possession and distribution of drugs.

f.  Individuals involved in drug dealing often take, or cause to be taken, photographs of themselves, their associates, their property, and their drugs, and usually maintain these photographs in their possession.

g.  Premises used by individuals involved in drug dealing usually contain articles of personal property evidencing the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises.

h.  Individuals involved in drug dealing often conceal evidence of their drug dealing in vehicles outside their residence in order to prevent detection and seizure by officers conducting search warrants at the residence.

i.  Individuals involved in drug dealing often keep documents relating to drug transactions long after the transaction is completed.  Thus, it is likely that such

documents are still on the premises and that they will provide evidence of the events set forth in this affidavit.

j.  Individuals involved in long-term drug dealing, specifically those who keep the same residence and telephone number over the long term, tend to continue their drug dealing without obvious changes in their operations in the same pattern and practice as in the past. Further, individuals who sell drugs for an extended period are likely to maintain fruits and/or instrumentalities of criminal activity and records of drug sales at their residence.

k.  As a result of my experience and training, I have learned that traffickers who deal in various quantities of controlled substances, or those that assist in that venture, maintain and tend to retain accounts or records of those transactions. Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of co-conspirators. These records may be kept on paper or contained in memory calculators or computers. It is also my experience that these traffickers tend to keep these accounts and records in their residence and in the areas under their control. It is my training and experience, that in the case of drug dealers, evidence is likely to be found where the dealers live. United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986). It is also my training and experience that where criminal activity is long-term or ongoing, equipment and records of the crime will be kept for some period of time. United States v. Greany, 929 F.2d 523, 525 (9th Cir. 1991).

l.  Based upon my experience and training, I have learned that drug traffickers often place their assets in names other than their own to avoid detection of those assets by law enforcement and the Internal Revenue Service (IRS); that those persons are commonly family members, friends, and associates who accept title of assets to avoid discovery and detection; that traffickers also often place assets in the ownership of corporate entities to avoid detection by law enforcement agencies and although these assets are in other individual(s) or corporate names, the traffickers continue to use these assets and exercise dominion and control over them. Typically traffickers keep records of those registrations and transactions in their residence.

m.  I have learned that narcotics traffickers use mobile telephones to communicate with one another, either by voice or text message. Mobile telephones preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other narcotics traffickers and the dates and times that they and/or the mobile telephone user dialed one another's telephones. Mobile telephones also contain in their memory a telephone book. This allows the user to store telephone numbers and other contact information; the information stored in a telephone used by a narcotics trafficker is evidence of the associations of the narcotics trafficker, some of which are related to his or her illegal business. Mobile telephones also contain in their memory text messages sent, received, and drafted by the mobile telephone user. The text message history of a narcotics trafficker's mobile telephone can contain evidence of narcotics trafficking because it shows the communications or planned communications of a narcotics trafficker and the telephone numbers of those with whom the narcotics trafficker communicated or

28

intended to communicate. Mobile telephones also have a voicemail function that allows callers to leave messages when the telephone user does not answer. Narcotics traffickers sometimes leave voice messages for each other and this is evidence both of their mutual association and possibly their joint criminal activity. Mobile telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crime when used by a narcotics trafficker. Mobile telephones can also contain photographic data files, which can be evidence of criminal activity when the user was a narcotics trafficker who took pictures of evidence of crime. Mobile telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones.

172. In summary, based upon my experience and training, and after consulting with other law enforcement officers experienced in drug investigations, I know that individuals involved in drug dealing often maintain at their residences, vehicles, and their persons the items described in **Attachment B**. Individuals involved in drug dealing often maintain paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances. Therefore, I am requesting authority to seize all the items listed in **Attachment B** to this Affidavit.

## Conclusion and Orders Sought

173. As a result of participating in this investigation, and through review and analysis of information received from various sources during this investigation, your affiant is familiar with all aspects of this investigation. On the basis of this familiarity and other information which your affiant has reviewed and determined to be reliable, your affiant alleges the following:

1) There is probable cause to believe that Thau Benh CAM, Arthur Lao Fong LO, Vinh Van VO, Tan Quoc TO, Reutha Rich YUN, Quintilian Minhquan HUYNH (AKA "Quincy"), Calvin TRUONG, and Peter TRUONG are involved in the Distribution of a Controlled Substance and a Conspiracy to Distribute a Controlled Substance in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

2) There is probable cause to believe that Thau Benh CAM, Bang Thai TANG, Calvin TRUONG, Quintilian Minhquan HUYNH (aka Quincy), Vincent Kwok Hung KAN and Tim TUYEN are involved in the Manufacturing of Marijuana and Conspiracy to Manufacture Marijuana in violation of Title 21, United States Code, Sections 841 (a)(1) and 846.

3) There is probable cause to believe that Thau Benh CAM, Arthur Lao Fong LO, Vinh Van VO, Tan Quoc TO, Quintilian Minhquan HUYNH (AKA "Quincy"), Calvin TRUONG, Bang Thai TANG, Vincent Kwok Hung KAN, Tim TUYEN, and others not yet identified, have committed violations of Title 21, United States Code, Section 843(b) - Use of a Communication Facility in Furtherance of a Drug Trafficking Felony and Title 21, United States Code, Section 846 - Conspiracy to Distribute Controlled Substances.

174. Therefore, your affiant respectfully requests that **Criminal Complaints** and **Arrest Warrants** be issued for Thau Benh CAM, Arthur Lao Fong LO, Vinh Van VO, Tan Quoc

TO, Quintilian Minhquan HUYNH (AKA "Quincy"), Calvin TRUONG, Bang Thai TANG, Vincent Kwok Hung KAN, Tim A. TUYEN, Reutha Rich YUN, and Peter TRUONG, for the foregoing violations.

175.    Based upon the above mentioned information, as well as previous training and experience, your affiant believes that there is probable cause to believe that the items contained within Attachment B will be located in the locations described in Attachments A-1, A-2, A-3, A-4, A-5, A-6, A-7, A-8, and A-9.  Your affiant respectfully requests that **search warrants** be issued for the locations further described in the incorporated Attachments A (A-1 through A-9), so that any items further described in Attachment B may be seized pursuant to those search warrants.

    A-1.  5911 Deepdale Way, Elk Grove, California
    A-2.  8700 Festival Drive, Elk Grove, California
    A-3.  9611 Pilliteri Way, Elk Grove, California
    A-4.  5926 Stacy Avenue, Sacramento, California
    A-5.  9744 Westfalen Way, Elk Grove, California
    A-6.  7911 Deer Creek, Sacramento, California
    A-7.  8930 White Star, Elk Grove, California
    A-8.  701 MacArthur Drive, Oakland, California
    A-9.  1257 Huntington Drive, Crescent City, California

        I declare, under the penalty of perjury that the foregoing is true and correct, to the best of my knowledge and belief.

Executed on July 14, 2008, at Sacramento, California.

Carrie McDougle, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before
me this 14th day of July 2008

HONORABLE EDMUND F. BRENNAN
United States Magistrate Judge

Approved as to Form:

7/14/08

Jill Thomas
Assistant U.S. Attorney